[No. H008497. Sixth Dist. Jan. 31, 1992.]

JEY LYANG YU, Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent;
JAY R. STROH, as Director, etc., Real Party in Interest.

[No. H008615. Sixth Dist. Jan. 31, 1992.]

KYUNG S. MIN et al., Petitioners, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent;
JAY R. STROH, as Director, etc., Real Party in Interest.

## COUNSEL

Jay-Allen Eisen, Ann Perrin Farina, Paul Nicholas Boylan, Pioda, Brayan, Ames, Helfrich & Wills and Luis C. Jaramillo for Petitioners.

St. Peter & Cooper, M. Armon Cooper and Jo-Linda Thompson as Amici Curiae on behalf of Petitioners.

Daniel E. Lungren, Attorney General, N. Eugene Hill, Assistant Attorney General and Henry G. Ullerich, Deputy Attorney General, for Respondent and Real Party in Interest.

## OPINION

**AGLIANO, P. J.**—We have consolidated these petitions for review of decisions of the Department of Alcoholic Beverage Control (Department), which were affirmed by the Alcoholic Beverage Control Appeals Board (Board). We have issued writs of review in both matters and have temporarily stayed revocation of petitioners' off-sale beer and wine licenses pending our review. The issue is whether, because of frequently occurring illegal drug transactions on the premises, the Department may revoke the off-sale alcohol licenses of petitioners without requiring proof that petitioners knowingly permitted the drug transactions or that the sale of alcohol caused or

contributed to the illegal conduct. We have determined the Department may revoke the licenses under its constitutionally based broad power to prevent licensed premises from becoming a nuisance and a police problem. Accordingly we will affirm the decisions of the Department.

*Yu*

The Department filed an accusation in three counts against petitioner Jey Lyang Yu, doing business as the Del Monte Market in Salinas, California. The accusation sought the revocation of Yu's off-sale beer and wine license. Count I charged that the licensee kept, suffered or used, or permitted to be kept or used, a disorderly house, in violation of Business and Professions Code section 25601.[1] Count II recited the commission of an illegal narcotics sale immediately outside the main premises entrance in violation of Health and Safety Code section 11352. Count III charged that the licensee permitted or suffered the premises to be used in a manner creating a law enforcement problem for the City of Salinas, and creating conditions contrary to the public welfare and morals in violation of California Constitution article XX, section 22 and of section 24200, subdivision (a).

The accusation recites numerous instances of drug transactions on or near the premises of petitioner's market. In count I, five such instances are listed occurring between February 3, 1989, and March 28, 1989, involving sales of marijuana and cocaine; count II consists entirely of the description of a drug transaction on February 3, 1989, when an individual "immediately outside" the main premises entrance sold cocaine to an investigator; and count III recites numerous instances when the Salinas Police Department was required to make calls, investigations, arrests or patrols concerning conduct at or near the licensed premises, occurring between January 1, 1988, and April 1, 1989, and involving among other things drug transactions, fighting and disorderly conduct, disturbances, stolen property, loitering, and "suspicious circumstances." The accusation charges that Salinas police were required to make calls to the premises more than 100 times in about 15 months.

The Department revoked the license on the grounds that: (1) petitioner kept, suffered or used, or permitted to be kept, suffered or used, a disorderly house, creating conditions injurious to the public welfare, morals, health, convenience and safety, under California Constitution article XX, section 22 and sections 24200, subdivision (a), and 25601; and (2) that petitioner permitted or suffered the premises to be used in a manner which created a law enforcement problem for the City of Salinas, in violation of California

---

[1]Further statutory references are to the Business and Professions Code unless otherwise stated.

Constitution article XX, section 22 and section 24200, subdivision (a). The Board affirmed the Department's decision.

According to the factual findings of the Department, the premises are similar to other neighborhood convenience stores and the petitioner sells dairy products, beer and wine, cigarettes, groceries, newspapers, candy and similar merchandise. People tend to congregate in and about the premises parking lot directly in front of the entrance and along both sides of the building. Many of the disturbances reported to the police have occurred in that area, and drug dealers use the parking area for their transactions and often select certain areas to secrete their contraband.

In its decision the Department recited the occurrence of drug transactions. On February 3, 1989, Department investigators purchased $10 worth of marijuana from one "Blue Boy" on the premises in the immediate presence of two clerks. On February 21, 1989, an investigator contacted one Rascon on the premises and bought a "dime bag" of marijuana from him for $10. The Department investigators testified that these drug sales took place about 15 feet from the counter and consumed less than a minute each; there was a clerk behind the counter at these times who may or may not have been watching. On March 6, 1989, the same investigator returned and was contacted by one Ponce near the video machines next to the entrance. The investigator asked Ponce if he had $10 worth of "weed." He gave him a $20 bill. Ponce went to the clerk on duty and obtained change and then gave the investigator change and a baggie of marijuana.

The decision further recites that on March 28, 1989, a Salinas police officer in full uniform stopped at the premises to purchase a candy bar. While he was standing in line to pay for it he saw the customer in front of him (Serrano) remove two baggies containing a white powder, drop them on the counter, turn his palm face up and say "eight ball." He then pushed the baggies toward the clerk. The clerk picked up one bag and said he did not know what it was. The officer then seized the baggies and arrested Serrano.

Further, as the investigators were leaving the premises after the drug transaction of February 3, 1989, one Jorge approached them just outside the front door and asked if they were interested in buying some "weed." They subsequently bought cocaine from him for $20.

The Department further found that Salinas police officers were required to make the calls, investigations, arrests or patrols concerning the subject premises as recited in the accusation. There were 109 such incidents.

The parties stipulated that the premises are located in a higher crime area than normal areas of the City of Salinas.

Petitioner has owned the premises for three years. He has been licensed since January 20, 1988. He has made attempts to disperse individuals crowded about outside and has called the police and instructed his employees to do so also. About a month before the filing of the accusation he hired a security company service to place a uniformed person on the premises on weekends from 6:30 p.m. to 10:30 p.m. to prevent loitering in the parking lot. Petitioner admits he could observe sales of marijuana in the parking lot. He contacted the police at least once monthly in 1989. He is on the premises daily from 9 a.m. to 10 p.m. (closing time) and although he is aware of cocaine and marijuana he has never seen any in the premises, other than a marijuana cigarette on the parking lot.

A police officer of the City of Salinas testified that during the time he had been so employed he observed that the number of calls to the particular beat including the licensed premises had an effect on other beats in the city by preventing adequate policing of other areas.

Larry Myers, a police captain of the City of Salinas, testified that in his experience when liquor licenses are revoked in high crime areas the drug problems decrease in those areas.

The Department found there was insufficient evidence to establish cause for disciplinary action under count II. But it found cause for discipline under counts I and III. The Department found the evidence established that petitioner kept, suffered or used, or permitted to be kept, suffered or used, a disorderly house or a place to which people abided or resorted to the disturbance of the neighborhood and for injurious purposes; and that petitioner permitted or suffered the premises to be used in a manner which created a law enforcement problem for the City of Salinas, and that he was either unwilling or unable to control the conduct of individuals congregating in the immediate area of the premises.

*Min*

The Department filed an accusation in two counts against petitioners Kyung and Myung S. Min, doing business as the San Martin Market in Salinas, California. The accusation sought to revoke the Mins' off-sale beer and wine license. Count I charged the keeping of a disorderly house, as in the Yu matter, and count II charged that the licensed premises caused a law enforcement problem for the City of Salinas and a condition contrary to public welfare and morals in violation of California Constitution article XX, section 22 and section 24200, subdivision (a). The accusation recited in support of count I the occurrence of eight narcotics transactions in the store

or near it and on the licensed premises; and in support of Count II recited 66 separate instances of law enforcement problems occurring on or about the premises, not all narcotics transactions, but rather a wide variety of disturbances of the peace and offenses including loitering, drunk disturbances, thefts, juvenile problems, and a large number of incidents described in cursory fashion as "miscellaneous patrol" or "suspicious person."

The Mins owned the business from 1982 to 1984, sold it and purchased the Del Monte Market (now owned by Yu), then sold that market and repurchased the San Martin Market January 1, 1988. Mr. and Mrs. Min each testified that they have not personally observed narcotics transactions on the premises but that they have had recurrent problems with loiterers and have on occasion had to eject such loiterers or call the police when they refuse to go. They each put in about 10 hours a day at the business. Due to persistent loitering at the premises Mr. Min put in a "No Loitering" sign. Also they hired a security guard company (A & B Security Company) in March 1990, to patrol the premises from 5 to 10 p.m. every day; however that firm quit in June. According to the owner of the security business, the guards were threatened by patrons of the premises and were afraid to work there. However, Min testified that the guards were all Anglos and his Hispanic customers did not get along with them. Min, on the Monday before the hearing, hired another company, Ultra Security, the same company hired by Yu.

There is a public telephone on the premises at San Martin market, which, according to the A & B guard, posed a problem by attracting persons to the premises and furnishing an excuse for loiterers to remain. Min testified that the phone caused problems of loitering and that it could not lawfully be removed.

As in the Yu case, several investigators for the Department testified that they participated in staged buys of marijuana on the premises in full view of the clerks at the counter although they did not know whether the clerks were actually watching. As in Yu, the actual transactions took less than a minute to consummate, and occurred within 10 to 20 feet of the cash register in some instances. The witnesses also were approached by drug sellers on the street outside the market and in the vicinity.

Larry Myers, Salinas police captain, testified that the premises are located in a high-crime area which accounts for more police activity than any area in Salinas. Further, he said that not all licensed premises in the area pose a problem to the police department; but police spend an inordinate amount of time at the premises here. The market has become a focus for the drug trade,

along with Yu's market. Larry Dale, a vice detective with the Salinas Police Department, testified that he has become a gang expert and is aware that since eight years ago the San Martin Market has become a central location of local gang activity, both meetings and drug dispersals. It is claimed as part of the territory of the San Martin Norteno gang. There have been problems there of sales of liquor to minors; minors tap adults on the shoulder as they go in and get them to buy liquor for the minors.

The Department found that the eight alleged narcotics transactions had occurred and that during 1988 and 1989 the Salinas Police Department made numerous calls, investigations, arrests and patrols concerning conduct or acts at or about the premises. It also found that a transaction involving the sale of marijuana took place inside the premises near the sales counter where two clerks observed it. It found that four other such transactions occurred within clear view of a clerk at the sales counter.

The Department found that "[a]lthough industrious, financially successful, apparently well-meaning, and law-abiding individuals, the respondents [petitioners] have allowed the premises to operate as a virtual haven for persons conducting illegal drug sales."

The Department revoked petitioners' license on the grounds that they kept a disorderly house and that they permitted violations of section 25601 (disorderly house statute) as to findings III through VIII of the Department's findings regarding specific narcotics transactions on the premises.

The Board affirmed the decision of the Department, finding however that the evidence supported only 11 of the 66 alleged police incidents at the premises, and that these 11 incidents along with the eight incidents alleged in count I over a 14-month period did not support a charge of maintaining the premises so as to unduly burden local police resources. However the Board found the incidents which were true did support revocation on the ground of using the premises as a disorderly house. The Board stated that although not all the incidents could be fairly charged to petitioners, their knowledge of the incidents is not required in a disorderly house case.

CONTENTIONS

We have issued writs of review as authorized by statute (§ 23090) and have consolidated the cases, which raise similar issues. The contentions are: (1) a license could not be revoked for drug violations on the premises without proof by the Department of the holder's actual knowledge and actual consent; (2) the Department erroneously placed the burden of proof of

knowledge of the drug transactions on the licensee; (3) there was no evidence of either licensee's actual knowledge or consent to the drug offenses, only evidence of efforts to control the illicit traffic; (4) knowledge of employees cannot be imputed to the licensee; (5) the determinations that these licenses will cause law enforcement problems is unsupported by the findings or the evidence.

### Discussion

The constitutional basis for the charges against petitioners is found in California Constitution article XX, section 22, the final authority for the Department's revocation and suspension powers. That section provides that "[t]he department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude." In "disorderly house" cases, the violation of law is furnished by section 25601 making it a misdemeanor to keep a disorderly house. The "public welfare or morals" concept is also reflected in the grounds for suspension or revocation stated in section 24200, subdivision (a). Both provisions were relied on here.

These cases present the issue whether a liquor license may be revoked without "fault" on the part of the licensee, an issue described as a difficult question, but not decided, in a recent court of appeal decision. (*McFaddin San Diego 1130, Inc.* v. *Stroh* (1989) 208 Cal.App.3d 1384, 1387-1388, fn. 3 [257 Cal.Rptr. 8]; hereafter *McFaddin*.) Also, petitioners contend that recently enacted section 24202, subdivision (b), prevents suspension or revocation of a liquor license because of drug transactions on the premises unless the licensee or his agent knows of the transactions or willfully consents to them.

## I. *Licensee's Knowledge of Illegal Transactions*

Petitioners argue the evidence does not sustain a finding that either knew of the drug transactions. They further argue that they were located in a high crime area and could not control the drug transactions.

The argument that a licensee tried, but failed, to control drug transactions, is somewhat inconsistent with the argument that he knew nothing about the transactions. Normally, preventive efforts are directed at known evils. In fact Yu's testimony shows an understanding that drug transactions sometimes occurred on the premises, as well as his attempts to stop this from happening. Min admitted only to problems with loiterers and rowdy persons but his

knowledge could be inferred from the frequency and intensity of drug activity on the premises testified to by the investigators and the police.

We conclude the record amply sustains findings of implied knowledge as to Min and actual knowledge as to Yu. There is, however, no evidence of complicity.

The Department made no finding of knowledge, nor did the Board; both agencies took the position that the occurrence of the transactions were per se violations of the disorderly house statute and that knowledge of the transactions was not required.

The precedent holds unanimously that the licensee has an "affirmative duty" to maintain an orderly house. (E.g., *Givens* v. *Dept. Alcoholic Bev. Control* (1959) 176 Cal.App.2d 529, 534 [1 Cal.Rptr. 446]; *Harris* v. *Alcoholic Bev. Con. Appeals Bd.* (1963) 212 Cal.App.2d 106, 119-120 [28 Cal.Rptr. 74]; *Morell* v. *Dept. of Alcoholic Bev. Control* (1962) 204 Cal.App.2d 504, 514 [22 Cal.Rptr. 405].) The cases reject the argument that the licensee is in a high crime area and can't control the situation, because it proves too much. If location alone prevented revocation, "the license of offending premises in a notorious neighborhood could not be suspended or revoked unless that [*sic*] Department clearly demonstrated that the establishment was a worse offender than its competitors. Conceivably under such a policy, concerted action on the part of a number of licensees to harbor the drunken patron would render all immune from discipline under the umbrella of the resultant 'area' conditions." (*Harris* v. *Alcoholic Bev. Con. Appeals Bd.*, *supra*, 212 Cal.App.2d at pp. 119-120.) The assertion that the licensee knew nothing of the objectionable activity taking place at the licensed premises has been frequently disposed of by saying (1) knowledge is not an element of proving the existence of a condition sufficient for revocation and (2) where there is evidence that the licensee's agents or employees knew about the illegal transactions, their knowledge is imputed to the licensee. (See, e.g., *Morell* v. *Dept. of Alcoholic Bev. Control*, *supra*, 204 Cal.App.2d at p. 514 [knowledge not required]; *Munson* v. *Dept. Alcoholic Bev. Control* (1967) 248 Cal.App.2d 598, 602 [56 Cal.Rptr. 805] [hearing officer specifically found there was knowledge, and no showing of specific permission is required]; *Harris* v. *Alcoholic Bev. Con. Appeals Bd.*, *supra*, 212 Cal.App.2d at pp. 118, 123-124 [law enforcement problem in itself is cause for revocation with no showing of knowledge, and further, knowledge may be presumed from regularity and frequency of occurrence of violations]; *Mercurio* v. *Dept. Alcoholic etc. Control* (1956) 144 Cal.App.2d 626, 630 [301 P.2d 474] [knowledge of the employees is imputed to the licensee]; *Endo* v. *State Board of Equalization* (1956) 143 Cal.App.2d 395, 397 [300 P.2d 366]

[knowledge not required unless the Department pleads knowledge in the accusation].)

The California Constitution authorizes the revocation of a license where the premises have essentially become a public nuisance. The constitutional provision says that the existence on the licensed premises of a condition injurious to the public welfare is enough for revocation. (Cal. Const., art. XX, § 22.) As in applying the law of nuisance, fault is not relevant; the power of the Department derives from the police power, to prevent nuisances regardless of anyone's fault in creating them. Thus it is said that the licensee is charged with preventing his premises from becoming a nuisance and it will not avail him to plead that he cannot do so. (*Givens* v. *Dept. Alcoholic Bev. Control, supra*, 176 Cal.App.2d 529.)

This interpretation of the power of the Department dates back to the very earliest decisions interpreting the Alcoholic Beverage Control Act, all of which held that there is no inherent right to sell intoxicating liquors, that the liquor business is fraught with danger to the community, and may therefore be either entirely prohibited, or permitted under such conditions as are prescribed by the regulatory agency, which has broad power in this respect. (See, e.g., *Tokaji* v. *State Board of Equalization* (1937) 20 Cal.App.2d 612, 615-616 [67 P.2d 1082]; *Empire Vintage Co.* v. *Collins* (1940) 40 Cal.App.2d 612, 617 [105 P.2d 391].) The courts viewed a liquor license as different from a license to conduct any other business, and believed that a license to sell liquor "is not a proprietary right within the meaning of the due process clause of the Constitution [Citation], nor is it a contract [Citation]; it is but a permit to do what would otherwise be unlawful, and consequently, a statute authorizing its revocation does not violate the due process clause, and it may be revoked without notice or hearing without invading any constitutional guarantees. [Citations.]" (*State Bd. of Equalization* v. *Superior Ct.* (1935) 5 Cal.App.2d 374, 377 [42 P.2d 1076].)

The statute was later amended to provide licensees procedural rights in challenging discipline or revocation, but although due process, notice and a hearing became available to the licensee, the fundamental premise for revocation remained, as expressed in the cases cited above such as *Givens*, *Harris*, and *Morrell*, the existence of a public nuisance in and about the licensed premises, regardless of the degree of fault of the licensee. Accordingly, a legal finding of good cause for revocation is tested by an abuse of discretion standard (*Hansen* v. *State Board of Equalization* (1941) 43 Cal.App.2d 176 [110 P.2d 453]), and a license may be revoked or denied when a licensed premises becomes a nuisance or a police problem. (*Parente* v. *State Board of Equalization* (1934) 1 Cal.App.2d 238 [36 P.2d 437]; *Harris*

v. *Alcoholic Bev. Con. Appeals Bd., supra,* 212 Cal.App.2d 106; *Morell* v. *Dept. of Alcoholic Bev. Control, supra,* 204 Cal.App.2d 504.)

The Department may deny an application for a license where the proposed licensee is located in a high-crime area adjacent to a college campus recently the scene of riots. (*Kirby* v. *Alcoholic Bev. etc. Appeals Board* (1972) 7 Cal.3d 433 [102 Cal.Rptr. 857, 498 P.2d 1105].) Denial of an off-sale license to a grocery store near a high school or college campus has been approved. (*Weiss* v. *State Board of Equalization* (1953) 40 Cal.2d 772 [256 P.2d 1]; *Kirby* v. *Alcoholic Bev. etc. Appeals Board, supra,* 7 Cal.3d 433.) Although a mere showing that waitresses went topless was not enough cause to revoke a license (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85 [84 Cal.Rptr. 113, 465 P.2d 1]), there was enough for revocation where entertainers danced "bottomless" or nude and there were incidents of sexual conduct between entertainers and patrons. (*California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390]; see Felman, *California* v. *La Rue: The Demise of the "Bottomless" Bar* (1973) 1 Pepperdine L. Rev. 129.)

Liquor licensing is unique. ■ While a license to practice a trade is generally considered a vested property right, a license to sell liquor is a privilege that can be granted or withheld by the state. (Hutchinson, *The Alcoholic Beverage Control Administration of the State Board of Equalization* (1945) 20 State Bar J. 59, 64.) ■ The revocation, as expressly stated in the Constitution, may be based on protecting the public welfare and morals, quite independently of any showing of fault of the licensee. (See Cal. Const., art. XX, § 22; *Harris* v. *Alcoholic Bev. Con. Appeals Bd., supra,* 212 Cal.App.2d 106.)

Petitioners seek to rely on *Boreta,* which holds that a restaurant may not have its on-sale license revoked because its waitresses are topless, based on a record devoid of connection between the toplessness and any lawless conduct. (See *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d 85.) The *Boreta* opinion is not authority for the proposition that a liquor license cannot be revoked without a demonstration that the disorderliness of the licensed premises results from the fact of its having a liquor license. *Boreta* differs from this case in that toplessness, unlike drug sales, is not illegal conduct. Here we have pervasive illegal conduct taking place on the licensed premises, an entirely different situation.

The *McFaddin* opinion observes that it is a difficult question whether a liquor license may be revoked without "fault," but did not decide the issue, pointing out that there the Department constructed its pleadings and conducted the hearing in such a way as to lead the licensee to believe that

knowledge would have to be shown for revocation. (*McFaddin, supra*, 208 Cal.App.3d at p. 1387, fn. 2.) *McFaddin* expressly states, however, that "[i]t is not necessary for a licensee to knowingly allow its premises to be used in a prohibited manner in order to be found to have permitted its use," and that revocation may be based on mere failure to prevent the objectionable conduct. (*Id.* at p. 1389.) Further, *McFaddin* differs from this case in that the record there showed extensive preventive efforts. (*Id.* at p. 1391.)

The discretion given to the Department to revoke or suspend licenses must be "legally" exercised, that is to say, "in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589, 594-595 [43 Cal.Rptr. 633, 400 P.2d 745].) There is abuse of discretion when the revocation is not based on a showing that the use of the premises is conduct contrary to public welfare or morals within the meaning of the constitutional provision. (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra*, 2 Cal.3d at p. 96.) ▮▮▮ Here there is ample evidence that the premises have become law enforcement problems, that the owners were actually or constructively aware of the problems, and that they were not effective in controlling the rampant drug trade on the licensed premises. We cannot find an abuse of discretion in revocation upon these facts.

## II. *Section 24202*

▮▮▮ An additional argument of petitioners is that section 24202 was recently enacted in response to *McFaddin* and that the statute requires a showing of knowledge. Section 24202, subdivision (b), provides: "[t]he department may not open or add an entry to a file or initiate an investigation of a licensee or suspend or revoke a license (1) solely because the licensee or an agent acting on behalf of the licensee has reported to a state or local law enforcement agency that suspected controlled substance violations have taken place on the licensed premises or (2) solely based on activities constituting violations described in such a report, unless the violations reported occurred with the actual knowledge and willful consent of the licensee."

The Board and the Department read the statute as applying only to reports initiated by the licensee to the Department. We agree that the statute merely presents a procedural prerequisite that an investigation or revocation not be premised only on the licensee's own report to the police unless his knowing facilitation of drug transactions can be shown. The plain language of the statute applies only to the method by which the Department acquires information about the problem and not to the nature of the substantive evidence required to revoke the license.

This analysis moots the question whether the statute applies retroactively to the conduct here.

### III. *Burden of Proof Requirements*

 Petitioners contend that the Department and the Board misapplied the burden of proof requirements of a defense under this statute. As we have pointed out, the statute does not impose any substantive requirements on the showing needed for revocation. Further, the Department did not need to show knowledge under the accusations as filed here, but only that the premises had become a police problem and a nuisance, of which ample evidence existed. Accordingly this contention is without merit.

### IV. *Other Statutory Arguments*

 An additional argument made by petitioners is that recent amendments to the forfeiture statutes show a legislative intent to require knowledge before revocation of a liquor license. Health and Safety Code section 11470, subdivision (e)(2), recently amended by the same bill amending section 24202, adds liquor licenses to the list of properties which may be forfeited for involvement in drug transactions, but provides that forfeiture can only occur when the licensed premises were used or intended to be used, with the actual knowledge and willful consent of the licensee, to facilitate violations of the narcotics laws. Petitioners point out that revocation and forfeiture amount to the same thing, loss of the license, and that the Legislature has not evinced any intent to treat them differently; and it has required knowledge for forfeiture, in the same bill requiring knowledge in connection with reports of drug transactions. (§ 24202.) The Legislative Counsel's Digest of Assembly Bill No. 1450, explained that in light of the overall purpose of the Bill, as in the case of forfeitures, the Legislature intended in section 24202, subdivision (b) to prevent revocation based solely on drug violations "occurring without the actual knowledge and willful consent of the licensee." (Stats. 1989, ch. 1195; Sen. Com. on Judiciary, regarding Assem. Bill No. 1450 (1989-1990 Reg. Sess.).)

However, the plain language of section 24202 cannot be varied on the basis of legislative committee reports and digests. Further, those reports do not in our opinion evince a plain intention to abrogate 70 years of judicial interpretation of the power of the Department to control licensed premises. The Legislative Counsel's Digest of Assembly Bill No. 1450 merely says that the bill (§ 24202) would "prohibit the department from opening or making an entry to a file, initiating an investigation of a licensee, or suspending or revoking a license (1) solely because the licensee has reported

to a state or local law enforcement agency that suspected controlled substance violations have taken place on the licensed premises, or (2) solely based on violations occurring without the actual knowledge and willful consent of the licensee." The two subsections (1) and (2) in the statute are both subordinate to and descriptive of the power of the department to open or make an entry to a file. Thus the requirements are not aimed at the quantum of evidence necessary for revocation; they are aimed at the quantum of evidence necessary to initiate an investigation. The language of the final statute reflects that purpose. As for the Senate Judiciary Committee Report on Assembly Bill No. 1450, that deals with the requirement that a forfeiture be premised on knowing conduct and does not refer to section 24202.

Further, not only do we think that section 24202 does not provide a defense to petitioners here, but it is plain that the Legislature did not require actual knowledge of drug transactions and consent thereto in order to justify revocation. Neither the constitutional provision, California Constitution, article XX, section 22, nor the statute, section 24200, subdivision (a), so provides; both refer only to the existence of a condition violative of public morals or the public welfare. Further, it is significant that the Legislature provided for *mandatory* revocation when the licensee knowingly permitted illegal drug transactions. (§ 24200.5.) This section shows legislative intent that knowledge is *not* required for *discretionary* revocation under section 24200, subdivision (a), which contains no such knowledge requirement.

■ We hold that the Department lawfully revoked the licenses at issue here because there was a sufficient showing the premises constituted a nuisance within the meaning of the statutes and the constitutional provision. (§§ 24200, subds. (a) and (b) and 25601; Cal. Const., art. XX, § 22.) The decisions of the Department in these matters revoking petitioners' off-sale liquor licenses are affirmed. We vacate our temporary stays of revocation, effective upon finality of this opinion.

Cottle, J., and Elia, J., concurred.

A petition for a rehearing was denied February 28, 1992, and petitioners' application for review by the Supreme Court was denied April 29, 1992. Mosk, J., Kennard, J., and George, J., were of the opinion that the application should be granted.