Filed 10/5/21; Certified for Publication 10/29/21 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, <br><br> Petitioner, <br><br> v. <br><br> ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, <br><br> Respondent; <br><br> IBPOE ELKS OF THE WORLD ARROWHEAD LODGE 896, <br><br> Real Party in Interest. | E075738 <br><br> (ABC Ct. No. AB9852) <br><br> OPINION |

ORIGINAL PROCEEDINGS; petition for writ of review.

Xavier Becerra and Rob Bonta, Attorneys General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper and Alice Q. Robertson, Deputy Attorneys General for Petitioner.

No appearance for Respondent.

1

Law Offices of Lawrence R. Bynum and Lawrence Bynum for Real Party in Interest.

The Department of Alcoholic Beverage Control (department), the petitioner in this writ proceeding, revoked the liquor license of real party in interest IBPOE Elks of the World Arrowhead Lodge 896 (Arrowhead Elks). The revocation was based on findings that, among other things, Arrowhead Elks had knowingly allowed cannabis sales events to be held on its licensed premises. Respondent Alcoholic Beverage Control Appeals Board (the appeals board) reversed, finding a lack of substantial evidence to support the department's decision.

We agree with the department that there is substantial evidence in the record to support its factual findings regarding the cannabis sales events and that, given those factual findings, it was statutorily required to revoke Arrowhead Elks's license.[1] Accordingly, we annul the appeals board's decision and reinstate the department's decision.

## I. FACTS[2]

Arrowhead Elks was established as a nonprofit organization in 1959. There was a period when Arrowhead Elks was affiliated with the national organization, the Improved

---

[1] In light of this conclusion, we need not address the parties' arguments regarding whether Arrowhead Elks's license was also properly revoked for the alternative reason that the organization is no longer qualified to hold the license because of changes in its affiliation and operation.

[2] Undesignated statutory references are to the Business and Professions Code.

Benevolent Protective Order of Elks of the World, Inc., though that is no longer so. Arrowhead Elks is the holder of a type 51 club license, which is a type of retail license issued to a nonprofit club, authorizing sale of beer, wine, and liquor to club members and their guests for on-premises consumption only.[3]  (See §§ 23320, subd. (b)(41) [schedule of licenses and fees], 23425 [defining "club"]; 23431 [describing privileges and restrictions for club licenses].)  The Arrowhead Elks intermittently uses its lodge in San Bernardino for its own purposes, but also regularly rents the premises out for other purposes.

In June 2019, the department issued an accusation seeking, as relevant here, to revoke Arrowhead Elks's license based on unlawful possession and sale of cannabis at the lodge.[4]  More specifically, the department alleged that (1) between August 15, 2018 and April 25, 2019, Arrowhead Elks had knowingly permitted the sale, or negotiations for sale, of controlled substances or dangerous drugs at its premises in violation of section 24200.5, subd. (a) (count 2); (2) Arrowhead Elks had knowingly permitted on its

---

[3]  The appeals board questioned whether a type 51 club license qualifies as a retail license.  It does, because it allows the holder to sell alcohol directly to the consumer, albeit only to its members and their guests, not the general public.  (See §§ 23026 [defining "'[r]etail sale' or 'sale at retail'" to mean "sale by an on- or off-sale licensee for consumption and not for resale"], 23431 [describing privileges and restrictions for club licenses].)  Arrowhead Elks has not argued otherwise in this proceeding.

[4]  In the nine-count accusation, counts 2 through 6 related to unlawful possession and sale of marijuana at the lodge.  Counts 8 and 9 alleged that Arrowhead Elks no longer qualified as a bona fide club and therefore was no longer qualified to hold its license. Counts 1 and 7 sought only temporary suspension of the license, not revocation, and the department's petition did not challenge the appeals board's order regarding those counts.

premises the possession of a controlled substance (cannabis) on two specific dates, August 15, 2018 and April 25, 2019 (counts 3 and 5), in violation of Health and Safety Code section 11357; and (3) on the same two dates, Arrowhead Elks had knowingly permitted on its premises possession of a controlled substance (cannabis) for purposes of sale (counts 4 and 6), in violation of Health and Safety Code section 11359.

After a contested hearing, an administrative law judge (ALJ) recommended that all counts of the accusation be sustained and that Arrowhead Elks' license be revoked. The ALJ found, as relevant here, that Arrowhead Elks "was fully aware that it was renting out the Licensed Premises to promotors and vendors for cannabis sales events." This conclusion was based on, among other things: (1) the testimony to that effect of two officers of the Arrowhead Elks, its "house chairman" and its "exalted ruler and president"; (2) the circumstance that on two occasions, August 15, 2018 and April 25, 2019, police had served search warrants on the premises and impounded substantial amounts of cannabis products, as well as other evidence indicating that cannabis was being sold on the premises; (3) evidence that another officer of the Arrowhead Elks, its "leading knight and vice president," had hired a security guard for the events and hired another person to put up and take down tables for vendors to use; (4) evidence that Arrowhead Elks had charged cannabis vendors $150 for vending space, plus $100 for "permit purposes" (even though no permits were obtained); and (5) evidence that a particular cannabis event promotor who goes by the name "Lyfe" or "McLyfe" attended a

4

membership meeting of the Arrowhead Elks in August 2017, at which an upcoming "Lyfeevent in January, 2018" was discussed.

The department adopted the ALJ's proposed decision in full. The appeals board, however, reversed the department's decision (except with respect to one of the counts not at issue here). As relevant here, the appeals board found that the decision as to the cannabis related counts was not supported by substantial evidence.

## II. DISCUSSION

The department contends that its decision to revoke Arrowhead Elks's license was supported by substantial evidence, so the appeals board's finding to the contrary should be annulled. We agree.

Both the department and the board are "constitutional agencies upon which limited judicial powers have been conferred." (*Walker v. Munro* (1960) 178 Cal.App.2d 67, 73; see Cal. Const., art. XX, § 22 [describing department's authority].) "'The administration of the Alcoholic Beverage Control Act . . . is initially vested in the department. Its decisions, however, are subject to administrative review by the board and a final order of the board is, in turn, subject to judicial review.'" (*Caressa Camille, Inc. v. Alcoholic Beverage Control Appeals Bd.* (2002) 99 Cal.App.4th 1094, 1099.) The scope of the review of the department's decisions is the same in the appeals board and this court. (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd. (Deleuze)* (2002) 100 Cal.App.4th 1066, 1071.) By statute, the review "shall not extend further than to determine, based on the whole record of the department as certified by the

5

board, whether: [¶] (a) The department has proceeded without or in excess of its jurisdiction. [¶] (b) The department has proceeded in the manner required by law. [¶] (c) The decision of the department is supported by the findings. [¶] (d) The findings in the department's decision are supported by substantial evidence in the light of the whole record. [¶] (e) There is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before the department."  (§ 23090.2; see also *ibid.* ["Nothing in this article shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence"].)

Arrowhead Elks has not argued that the evidence was insufficient to support the ALJ's finding that cannabis sales events were held at Arrowhead Elks's premises on August 15, 2018 and April 25, 2019.  To the contrary, it has affirmatively conceded in briefing that its "agents allowed the promotors to use the licensed premises and those individuals used it to engage in unlawful activity."  Among other things, on the dates above, police executed search warrants at the property, impounding substantial amounts of cannabis, as well as gathering other evidence that left no doubt about the nature of the events.

There is also no reasonable dispute that Arrowhead Elks knew that the cannabis sales events were being held at its premises.  In testimony at the hearing before the ALJ, Arrowhead Elks's "house chairman" testified that he, under the "guidance" of the organization's "exalted ruler," was responsible for leasing out the organization's

6

premises for various events, including cannabis events organized by promotors. The "exalted ruler" also conceded that he knew "cannabis events" were being held at Arrowhead Elks' lodge. He also testified that he personally ensured that during cannabis events, including on August 15, 2018 and April 25, 2019, all alcohol was removed from the lodge's bar and put into a locked "alcohol closet," to which he had the only key. There was evidence that another Arrowhead Elks officer, its "leading knight," hired a security guard for the cannabis events and hired another person to put up and take down tables for vendors. There was also evidence that Arrowhead Elks collected money directly from cannabis vendors, both for space to sell their wares on the premises and for "permit purposes." The several officers' knowledge of the events taking place on Arrowhead Elks' premises is imputed to the organization. (*Yu v. Alcoholic Beverage Control Appeals Bd.* (1992) 3 Cal.App.4th 286, 295.)

Additionally, there is no question that the cannabis sales events that took place at Arrowhead Elks's premises were unlawful. Cannabis remains a controlled substance under California law, despite the passage of Proposition 64, which legalized its recreational use. (Health & Saf. Code, §§ 11007, 11054, subd. (d)(13).) The commercial sale of cannabis is regulated under the Medicinal and Adult-Use Cannabis Regulation and Safety Act (MAUCRSA) (§ 26000 et seq.). It is not possible to be licensed to sell cannabis at a premises also licensed for the sale of alcohol. (Cal. Code Regs., tit. 16, § 5601, subd. (g) ["a temporary cannabis event license shall not be issued for a premises that is licensed for the sale of alcohol or tobacco"]; see also *id.* § 5026, subds. (c)

7

[premises licensed under MAUCRSA "shall not be in a location that requires persons to pass through a business that sells alcohol . . . to access the licensed premises"] & (d) [premises licensed under MAUCRSA "shall not be in a location that requires persons to pass through the licensed premises to access a business that sells alcohol..."]; Bus. & Prof. Code, § 25621.5 ["A licensee [under the Alcoholic Beverage Control Act] shall not, at its licensed premises, sell, offer, or provide cannabis or cannabis products"].) Although Arrowhead Elks's house chairman testified that the promoters showed him and the leading knight their "license" for the events, he was either mistaken about the scope of the permissions the promoters had obtained, or he was not telling the truth.

Relying on *Laube v. Stroh* (1992) 2 Cal.App.4th 364 (*Laube*), Arrowhead Elks argues that the evidence is nevertheless insufficient to sustain the department's ruling because there is no evidence that Arrowhead Elks "kn[ew] that the licensed premises were to be used in an unlawful manner." It notes that there was no finding that its members or corporate officers were present for the cannabis events. It also emphasizes the house chairman's testimony that "a license was presented" to him, and asserts that whether commercial cannabis sales are unlawful "becomes complicated" in light of MAUCRSA.

Arrowhead Elks's arguments based on *Laube* fail for at least three reasons. First, as discussed above, there is nothing complicated about whether temporary cannabis sales events such as those at issue here could be licensed to take place at a location that is already licensed to sell alcohol. The Alcoholic Beverage Control Act (§ 23000 et seq.),

8

under which Arrowhead Elks's liquor license was issued, states plainly that "[a] licensee shall not, at its licensed premises, sell, offer, or provide cannabis or cannabis products." (§ 25621.5.) The MAUCRSA implementing regulations state equally plainly: "A temporary cannabis event license shall not be issued for a premises that is licensed for the sale of alcohol or tobacco." (Cal. Code Regs., tit. 16, §§ 5601, subd. (g); see also *id.*, § 5026, subds. (c) & (d).) Arrowhead Elks, as the holder of a liquor license, is responsible for familiarizing itself with the law relating to use of its licensed premises and operating those premises in accordance with the law. (See, e.g., *Givens v. Dept. of Alcoholic Bev. Control* (1959) 176 Cal.App.2d 529, 534 ["[A]n on-sale licensee has an affirmative duty to maintain properly operated premises"]; see also *5501 Hollywood, Inc. v. Department of Alcoholic Beverage Control* (1957) 155 Cal.App.2d 748, 753 ["Although the licensee is not required to act at his peril, he must exercise the caution which would be shown by a reasonable and prudent man in the same circumstances"].) A reasonably prudent holder of a liquor license would either know, or would take the trouble to learn, that under current law there is no such thing as a license that would permit the temporary cannabis events, just as the licensee would know there is no such thing as an identification card that would allow a minor to be served alcohol.

Second, *Laube* does not support Arrowhead Elks's claim that it permits a licensee to escape liability because it did not know an activity it allowed to take place on its premises was unlawful. *Laube* is about ignorance of the facts, not of the law. In *Laube*, discipline was imposed on licensees who did not know, and at least arguably had no

9

reason to know, that several transactions for the sale of small amounts of illegal drugs had taken place on their premises.[5] (*Laube*, *supra*, 2 Cal.App.4th at pp. 367-370.)  The Court of Appeal found it "defie[d] logic to charge someone with permitting conduct of which they are not aware." (*Id*. at p. 377.)  Thus, it held as follows: "a licensee must have knowledge, either actual or constructive, before he or she can be found to have 'permitted' unacceptable conduct on a licensed premises." (*Ibid.*)  The straightforward interpretation of this holding, given the facts before the *Laube* court, is that a licensee must have knowledge, either actual or constructive, *of the unacceptable conduct*. Arguably, *Laube* has no application to a circumstance like that of the present case, where there is no question that the licensee knew about the conduct at issue, and there is only a dispute about whether the licensee knew the conduct was unlawful.  Or, to put this perspective in *Laube*'s terms, given that Arrowhead Elks had actual knowledge of the *conduct* occurring on its premises, it also had at least constructive knowledge of the *unlawfulness* of that conduct, and thus the unlawfulness of its own decision to permit such conduct.  (See *People v. Noori* (2006) 136 Cal.App.4th 964, 978, quoting *Barlow v. United States* (1833) 32 U.S. 404, 411 [it is "'a common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally]".)

---

[5] *Laube* involved two consolidated cases.  (*Laube*, *supra*, 2 Cal.App.4th at p. 366.)  In one, the transactions were for sale of small amounts of cocaine between a patron and an undercover investigator; in the other, the transactions involved an off duty employee of the licensee, who sold small amounts of methamphetamine and cocaine to an undercover investigator.  (*Id.* at pp. 368-370.)

Third, even if we were to assume that *Laube* applies here, the case in fact supports the department's decision to revoke Arrowhead Elks's license. The holding of *Laube* works to the benefit of a licensee that had no reason to know (either actually or constructively) about illegal conduct on its premises. But the case also reaffirms the principles that (1) the licensee's "general, affirmative duty to maintain a lawful establishment" includes "the obligation to be diligent in anticipation of reasonably possible unlawful activity," and (2) that "[o]nce a licensee knows of a particular violation of the law, that duty becomes specific and focuses on the elimination of the violation." (*Laube*, *supra*, 2 Cal.App.4th at p. 379.) "Failure to prevent the problem from recurring, once the licensee knows of it, is to 'permit' by a failure to take preventive action." (*Ibid.*; see also § 24200.5, subd. (a) ["Successive sales, or negotiations for sales, over any continuous period of time shall be deemed evidence of permission"].) Here, under any view of the facts, Arrowhead Elks received notice of the illegality of the cannabis events held on its property no later than when police executed a search warrant on August 15, 2018. Thus, at the very least as to the charges relating to the events of April 25, 2019, when a second search warrant was executed, the evidence supports the conclusion that Arrowhead Elks knew (either actually or constructively) not only of the cannabis sales event, but its unlawful nature. Under *Laube*, Arrowhead Elks at a minimum permitted the second event by failing to prevent it once it learned of the unlawfulness of the earlier one.

Arrowhead Elks further argues that the evidence is insufficient to sustain the department's decision because there was no evidence that "illegal drug sales or possession occurred while [it] was operating its club license, or when its members or corporate officers were present." It points out that, as a "social club," it "operates on a temporary or intermittent basis and only when its members are present." The idea here is, essentially, since the alcohol was locked away and no club members were present during the cannabis sales events, Arrowhead Elks was not using its license at the time, so it should not be subject to discipline based on the activities of the nonmember promoters, vendors, and customers. Both the department and the appeals board rejected this line of argument, as do we. The prohibitions at issue are not triggered by whether the premises were open for the sale of alcohol at the time, but by whether the premises are licensed for the sale of alcohol, and whether Arrowhead Elks allowed those premises to be used in an unlawful manner. (See Cal. Code Regs., tit. 16, §§ 5601, subd. (g), 5026, subds. (c) & (d); § 25621.5; see also 55 Ops.Cal.Atty.Gen. 342 (1972) ["A licensed establishment . . . does not lose its character as 'public premises'" during hours when alcoholic beverages are not allowed to be sold or consumed].) Arrowhead Elks cites no authority in support of its view that the prohibitions are inoperative when alcohol is not actually for sale, as there is no such authority.

We conclude that there was substantial evidence in support of the department's decision. At a minimum, even under the reading of *Laube* most favorable to Arrowhead Elks, there is substantial evidence to find it permitted the cannabis sales event on April

25, 2019, even though it knew (either actually or constructively) that the event was unlawful. That is enough to justify the department's decision to sustain the accusation at least as to counts 2, 5 and 6, any one of which would support the revocation of Arrowhead Elks's liquor license. Indeed, revocation is mandatory where a retail licensee "has knowingly permitted the illegal sale, or negotiations for the sales, of controlled substances . . . upon his or her licensed premises." (§ 24200.5, subd. (a).)

### III. DISPOSITION

The decision of the Appeals Board is annulled, and the decision of the Department to revoke Arrowhead Elks's license is reinstated. The parties shall bear their own costs of this writ proceeding.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
                                                              J.

We concur:

CODRINGTON_____
            Acting P. J.

SLOUGH_____
                  J.

13

Filed 10/29/21

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL,<br>        Petitioner,<br>v.<br>ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD,<br>        Respondent;<br><br>IBPOE ELKS OF THE WORLD ARROWHEAD LODGE 896,<br>        Real Party in Interest. | E075738<br><br>(ABC Ct. No. AB9852)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

A request was made to this court pursuant to California Rules of Court, rule 8.1120(a) for publication of a nonpublished opinion heretofore filed in the above-entitled matter on October 5, 2021, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c).

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b). The opinion filed in this matter on October 5, 2021, is certified for publication.

CERTIFIED FOR PUBLICATION

RAPHAEL _____
                                                                                J.

We concur:

CODRINGTON _____
                Acting P. J.

SLOUGH _____
                J.

1